**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**EXECUTIVE TRIM CONSTRUCTION, INC.,**
*doing business as* **Executive Group,**

                                        **Plaintiff,**

         vs.                                                    **1:20-cv-544**
                                                                **(MAD/DJS)**
**CHRISTOPHER GROSS; SUDDATH VAN**
**LINES, INC.,** *a Florida Corporation***; and**
**SUDDATH VAN LINES, INC.,** *doing business as*
**Suddath Workplace Solutions,**

                                        **Defendants.**

_____

**APPEARANCES:**                              **OF COUNSEL:**

**ROEMER WALLENS GOLD & MINEAUX, LLP**        **MATTHEW J. KELLY, ESQ.**
13 Columbia Circle
Albany, New York 12203
Attorneys for Plaintiff

**SCOLARO, FETTER LAW FIRM**                  **CHAIM JAFFE, ESQ.**
507 Plum Street
Suite 300
Syracuse, New York 13204
Attorneys for Defendant Christopher Gross

**GEORGE W. WRIGHT & ASSOCIATES, LLC**        **GEORGE W. WRIGHT, ESQ.**
505 Main Street
Suite 106
Hackensack, New Jersey 07601
Attorneys for Defendant Suddath Van Lines, Inc.

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Executive Trim Construction, Inc. ("Executive") commenced this action on May

14, 2020, and filed a motion for temporary restraining order and preliminary injunction that same day. *See* Dkt. Nos. 1 & 2. On May 15, 2020, the Court granted Plaintiff's motion for a temporary restraining order and directed expedited briefing on the pending motion for preliminary injunctive relief. *See* Dkt. No. 8. After granting several requests by the parties for extensions of time, the Court held a hearing on the request for injunctive relief. On September 2, 2020, the Court denied Plaintiff's request for a preliminary injunction and dissolved the temporary restraining order then in place. *See* Dkt. No. 71.

Currently before the Court are Defendants' motion to dismiss the complaint and Plaintiff's cross-motion to amend the complaint. *See* Dkt. Nos. 38 & 50.

## II. BACKGROUND

Plaintiff is a domestic corporation duly licensed to do business in the State of New York, with its principal place of business in Gloversville, New York. *See* Dkt. No. 1 at ¶ 2. Defendant Christopher Gross was a resident of Wilton, Connecticut and formerly employed by Plaintiff. *See id.* at ¶ 4. Defendant Suddath Van Lines, Inc. ("Suddath") is a foreign corporation doing business within the State of New York, with a principal place of business in Jacksonville, Florida. *See id.* at ¶ 5.

Defendant Gross was hired by Plaintiff in April 2018 and was hired to provide sales work within the greater New York area. *See id.* at ¶ 7. Plaintiff is engaged in the business of selling, warehousing, freight, and installation services of furniture, fixtures and equipment to the hospitality industry and others in the eastern United States. *See id.* at ¶ 9. The business is regularly conducted by a bid process which requires consideration and evaluation of specific requests in a bid proposal. *See id.* Plaintiff claims that "[c]alculation of a bid in response requires

an understanding of the specific worksite and the available labor force to complete the project. These calculations have been developed by Executive Group after years of first-hand experience and constitute trade secrets." *Id.* Further, Plaintiff claims that "[t]his information would not be known to people outside the business and is limited to specific individuals who calculate the bid amounts. It is guarded against disclosure to anyone else. The information is the coin of the realm in the business and has been developed over years of first-hand experience." *Id.*

On April 30, 2020, Defendant Gross left his employment with Plaintiff. *See id.* at ¶ 10. In the complaint, Plaintiff contends that, unbeknownst to it, Defendant Gross "engaged in a scheme to defraud, and did engage in unfair competition and breach his duty of loyalty to plaintiff, all meant to harm the business of the plaintiff hereto and enhance [his] position as a future employee of the defendant, Suddath Van Lines, Inc. d/b/a Suddath Workplace Solutions, by transmitting and delivering bid calculations and amounts on several current matters to Suddath's employee." *Id.* at ¶ 11. In its proposed amended complaint, Plaintiff has attached emails between Defendant Gross and Brad Jones of Suddath, "wherein proprietary documents consisting of protected trade secrets were first solicited by Mr. Jones, and then disclosed by Defendant Gross." Dkt. No. 50-2 at ¶ 12. The proposed amended complaint further alleges that "[t]hese bid documents were transmitted after the termination of Christopher Gross' employment with Executive Group, and therefore he no longer had any authorized access to these proprietary materials. During the time of his employment, the transfer of such documents exceeded any authorized access that defendant Gross had, as noted in the Employee Handbook." *Id.* at ¶ 15. Additionally, the proposed amended complaint contends that Suddath's purpose in recruiting Defendant Gross was to make an entry into the New York market and that "[t]his was heightened by Suddath's desire to usurp Executive

Group's corporate opportunities, and Mr. Gross's willingness to misappropriate trade secrets and defame the plaintiff in order to be hired at Suddath." *Id.* at ¶ 16.

Further, Plaintiff claims that Defendant Gross engaged in slander *per se* both during and subsequent to his employment with Plaintiff, "by contending that the plaintiff's business operations were not stable and inferred plaintiff was not likely to remain as an ongoing entity." Dkt. No. 1 at ¶ 12.  Plaintiff alleges that Defendant Gross "did tell other people, both within and without the industry that plaintiff's business was failing and that it was unlikely to be able to continue in business." *Id.* at ¶ 13.  Plaintiff claims that Defendant Gross's conduct harmed its reputation and damaged its business. *See id.* at ¶ 14.

In its complaint dated May 14, 2020, Plaintiff asserts the following causes of action:

> (1) First Cause of Action against Defendant Christopher Gross for breach of duty of loyalty to Plaintiff;
>
> (2) Second Cause of Action against Defendants Gross and Suddath Van Lines, Inc. for diversion of corporate opportunities;
>
> (3) Third Cause of Action against Defendant Gross for slander *per se*;
>
> (4) Fourth Cause of Action against Defendants Gross and Suddath for tortious interference with Plaintiff's prospective business relationships with its customers;
>
> (5) Fifth Cause of Action against Defendant Gross for breach of fiduciary duty to Plaintiff;
>
> (6) Sixth Cause of Action against Defendants Gross and Suddath for unfair competition;
>
> (7) Seventh Cause of Action against Defendants Gross and Suddath for "hacking" of Plaintiff's computers pursuant to 18 U.S.C. § 1030; and
>
> (8) Eighth Cause of Action against Defendants Gross and Suddath

4

for misappropriation of trade secrets pursuant to 18 U.S.C. §§ 1832-1836.

Dkt. No. 1; Dkt. No. 50-2.

## III. DISCUSSION

### A.      Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief.  *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007).  In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability

5

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."
*Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely
consistent with' a defendant's liability, it 'stops short of the line between possibility and
plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately,
"when the allegations in a complaint, however true, could not raise a claim of entitlement to
relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line
from conceivable to plausible, the[] complaint must be dismissed[,]" *id.* at 570.[1]

Rule 15 of the Federal Rules of Civil Procedure governs the amendment of pleadings prior
to trial. *See* Fed. R. Civ. P. 15. Where, as here, leave of court is required to amend, the court has
broad discretion to grant such leave "freely," "when justice so requires." Fed. R. Civ. P. 15(a)(2).
The Rule encourages courts to determine claims "on the merits" rather than disposing of claims or
defenses based on "mere technicalities." *Monahan v. NYC Dep't of Corr.*, 214 F.3d 275, 283 (2d
Cir. 2000) ("Rule [15] reflects two of the most important principles behind the Federal Rules:
pleadings are to serve the limited role of providing the opposing party with notice of the claim or
defense to be litigated, ... and 'mere technicalities' should not prevent cases from being decided on
the merits") (internal citations omitted).

---

[1] In Defendants' motion to dismiss and Plaintiff's response thereto, both sides rely on
several documents that were made a part of the record in this case in relation to the motion for a
preliminary injunction. For example, Defendants repeatedly reference Plaintiff's Rule 807
statement. *See, e.g.*, Dkt. No. 38-4 at 21. At this stage, however, unless these documents have
been included as part of the proposed amended complaint or they are integral to it, the Court may
not rely on them in deciding Defendants' motion to dismiss. *See Privado Marketing Grp. LLC v.
Eleftheria Rest. Corp.*, No. 13-cv-3137, 2014 WL 3377107, *4 n.7 (S.D.N.Y. July 7, 2014)
(refusing the plaintiffs' request to take judicial notice "of the preliminary injunction materials on
the grounds that they are court records and thus are publicly available" because this "approach
would eviscerate the general rule precluding courts from considering extrinsic documents on a
motion to dismiss").

The Second Circuit has explained that "district courts should not deny leave [to amend] unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000).  Courts in the Second Circuit have held that denial of a motion to amend is appropriate where "(1) the movant is guilty of undue delay, (2) the movant has acted in bad faith, (3) the amendment would be futile, or (4) the amendment would prejudice the opposing party." *Procter & Gamble Co. v. Hello Prod., LLC*, No. 14 Civ. 649, 2015 WL 2408523, *1 (S.D.N.Y. May 20, 2015) (citing *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)); *see also Williams v. Citigroup Inc.*, 659 F.3d 208, 213-14 (2d Cir. 2011) (reiterating Supreme Court precedent explaining the proper grounds for denying a motion to amend as "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment").[2]

Here, since Defendants had adequate notice and time to respond to the proposed amended complaint, the Court will consider the motion to dismiss in light of the new allegations.  *See Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 226 (E.D.N.Y. 2015) ("Here, as the Defendants had sufficient opportunity to respond to the proposed amended complaint, the merits of the Defendants' motions to dismiss will be considered in light of the

---

[2] In their response to Plaintiff's cross-motion to amend, Defendants argue that the motion should be denied because Plaintiff failed to comply with, among other things, Local Rule 7.1(a)(4)'s requirement that a motion to amend must be accompanied by "a redline/strikeout version of the pleading sought to be amended." Dkt. No. 70 at 7-8.  While Defendants are correct that Plaintiff failed to comply with Local Rule 7.1, both the complaint and proposed amended complaint in this action are relatively concise and the proposed amendments are easily identified. As such, the Court denies Defendants' request to deny Plaintiff's motion to amend on this ground. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules") (citations omitted).

amended complaint"); *Schwartzco Enterprises LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 338 (E.D.N.Y. 2014) ("Where, as here, the Plaintiff seek[s] to amend his complaint while a motion to dismiss is pending, a court has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion to dismiss as moot to considering the merits of the motion in light of the amended complaint").

**B.     First Cause of Action: Breach of the Duty of Loyalty**

In its first cause of action, Plaintiff claims that Defendant Gross breached the duty of loyalty that he owed to it "by engaging in a scheme to disclose confidential business information and trade secrets to a potential competitor of the plaintiff and Gross' future employer, Suddath Van Lines, Inc. and Suddath Van Lines, Inc. d/b/a Suddath Workplace Solutions." Dkt. No. 50-2 at ¶ 37. In their motion to dismiss, Defendants contend that this claim fails to comply with Rule 8 and that absent from the complaint are any allegations that Plaintiff lost a particular bid "because of" or but for any acts of Defendant Gross. *See* Dkt. No. 38-4 at 11. Rather, Defendants contend that it is undisputed that Suddath has not been awarded or promised a contract as a result of receiving Plaintiff's subject bid materials and that any allegations of damages by Plaintiff are mere conjecture and should be rejected. *See id.*

"'New York law with respect to disloyal or faithless performances of employment duties is grounded in the law of agency, and has developed for well over a century.'" *KatiRoll Co., Inc. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 368 (S.D.N.Y. 2014) (quoting *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)). "That is, the duty of loyalty means an agent is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Id.* (quoting *Phansalkar*, 344 F.3d at 200). Under New York law, however, duty of loyalty claims are

"'limited to cases where the employee, acting as the agent of the employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks.'" *Id.* (quotation and other citations omitted); *see also Primiani v. Vintage 185 Inc.*, No. 2:18-cv-2237, 2019 WL 486087, *4 (E.D.N.Y. Feb. 6, 2019) (citing cases).

In the present matter, nothing in the proposed amended complaint or exhibits attached thereto plausibly suggests that Defendant Gross, while still employed by Plaintiff and working as its agent, diverted business opportunities to himself or Suddath to Plaintiff's detriment, or that he accepted an improper kickback.  Further, in support of this claim, Plaintiff alleges that "defendant Gross did breach that duty of loyalty by engaging in a scheme to disclose confidential business information and trade secrets to a potential competitor of the plaintiff and Gross' future employer, Suddath[.]"  Dkt. No. 50-2 at ¶ 37.  Again, this allegation fails to suggest that Plaintiff actually diverted any business opportunity.  Moreover, nothing in the proposed amended complaint suggests that Defendant Gross solicited Plaintiff's current or prospective customers while he was still employed by Plaintiff.  Rather, all of the emails attached to the proposed amended complaint make clear that any solicitation occurred after Defendant Gross had terminated his employment with Plaintiff.  *See* Dkt. No. 50-2 at 107-12.  Absent a contractual provision prohibiting such conduct, upon termination of his employment with Plaintiff, with certain limitations, Defendant Gross was free to solicit business from customers in competition with Plaintiff.  *See Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) (holding that the defendant does not breach the duty of loyalty by soliciting his former employer's clients after the defendant's employment had been terminated) (citations omitted).

Accordingly, the Court denies Plaintiff's motion to amend as to the first cause of action and grants Defendants' motion to dismiss.

**C.      Second Cause of Action: Diversion of Corporate Opportunities**

"The corporate opportunity doctrine provides that 'corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'" *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13 Civ. 4650, 2015 WL 7078641, *4 (S.D.N.Y. Nov. 12, 2015) (quoting *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 147 A.D.2d 241, 246 (1st Dep't 1989); *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 671-72 (S.D.N.Y. 2005)).  "In addition to showing that a corporate opportunity exists, however, a plaintiff asserting a claim for usurpation must also show that the defendant took that opportunity for himself." *Id.* (citing *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 88 (2d Cir. 1973)) (other citations omitted); *see also Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 413 (E.D.N.Y. 2012) (noting that the corporate opportunity doctrine precludes corporate fiduciaries from "divert [ing] and exploit[ing] for their own benefit any opportunity that should be deemed an asset of the corporation"); *In re Marine Risks, Inc.*, 441 B.R. 181, 208 (Bankr. E.D.N.Y. 2010) ("The fiduciary must 'divert[ ] that expectancy to his own profit'") (quotation omitted).

In the present matter, in the proposed amended complaint, Plaintiff alleges that Defendant Gross diverted corporate opportunities to Suddath by his "scheme," that included "diversion of corporate information and bidding documents, as well as other sensitive, corporate proprietary information and trade secrets as to bid computation, and all defendants were engaged in this action."  Dkt. No. 50-2 at ¶ 41.  As Defendants note, absent from the proposed amended complaint are allegations that Defendants actually took an opportunity from Plaintiff for themselves.  *See* Dkt. No. 38-4 at 12.  In its response to Defendants' motion, Plaintiff argues solely that its outstanding bids constituted "corporate opportunities."  Nothing in this response,

however, addresses the fact that the proposed amended complaint does not allege that either of the Defendants seized any such corporate opportunity to Plaintiff's detriment.  For example, the proposed amended complaint does not allege that Suddath undercut any of Plaintiff's bids using the confidential information provided by Defendant Gross (or that they even submitted a competing bid).  Since Plaintiff has failed to allege that Defendants took any of these corporate opportunities for themselves, this claim must be dismissed.

Accordingly, Defendants' motion to dismiss is granted as to this claim and Plaintiff's motion to amend is denied.

**D.    Third Cause of Action: Defamation**

In its third cause of action, Plaintiff contends that Defendant Gross "did engage in slander per se and defamation as against [it]."  Dkt. No. 50-2 at ¶ 44.  In their motion to dismiss, Defendants argue that Plaintiff fails to identify with any specificity the alleged defamatory statements that Defendant Gross made, when the alleged statements were made, and to whom they were allegedly made.  *See* Dkt. No. 38-4 at 15.  Further, Defendants contend that, to the extent that Plaintiff intends to rely on the alleged defamatory statements contained in its Rule 807 Statement, these statements are clearly opinions that are not actionable.  *See id.* at 17-19.  In response, Plaintiff alleges that "Defendant Gross made statements via email to several business partners of Executive Group, including Flintlock Construction, Actium Development, a representative of the developer for The Park-Meridien Hotel, Lam Group, and two representatives of an unidentified company named Victor Garcia and George DaSilva."  Dkt. No. 50-10 at 13.  According to Plaintiff, in those emails, "Defendant Gross stated, among other things, that 'EG was growing to [sic] fast to keep up with it's [sic] expenses,' and implied that Executive Group was unstable and financially insecure."  *Id.*  Plaintiff claims that, "[g]iven the immediate consequences

11

in the aftermath, where Executive Group was denied a bid from a recipient of one of these messages, forced to offer a concession on a second, and required to provide audited financial statements and post a bond on a third, where no such requirements had ever been imposed on Plaintiff before, it is undeniable that serious harm has resulted in fact from the messages sent to these clients by Defendant Gross." *Id.*

"Libel is a method of defamation expressed in writing or print." *Rosenberg v. Metlife, Inc.*, 453 F.3d 122, 123 n.1 (2d Cir. 2006) (quoting *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)).  Under New York law, a "plaintiff must establish five elements to recover in libel: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." *Id.*  Defamation *per se* includes four categories of statements: (i) charging the plaintiff with a serious crime; (ii) statements that tend to injure another in his or her trade, business or profession; (iii) claiming that the plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman.  *See Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992).

Relevant here is the second category of defamation *per se*, which "has been defined both as statements that cast doubt on a particular quality at the very heart of a profession and statements that impugn the basic integrity of a business." *Kforce, Inc. v. Alden Personnel, Inc.*, 288 F. Supp. 2d 513, 516 (S.D.N.Y. 2003).  "Thus, 'a writing which *tends* to disparage a person in the way of his office, profession or trade' is defamatory *per se* and does not require proof of special damages." *Id.* (quoting *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985)) (emphasis in original).  Additionally, "'[w]here a statement impugns the basic integrity or creditworthiness of a

business, an action for defamation lies and injury is conclusively presumed.'" *Id.* (quoting *Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518, 522 (1981)) (other citations omitted); *see also Langenbacher Co. v. Tolksdorf*, 199 A.D.2d 64, 65 (1st Dep't 1993) (holding that statements that impugn "the basic integrity, creditworthiness and competence of the business" are defamatory *per se*); *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163 (2d Cir. 2000).

"'Loose, figurative or hyperbolic statements' and 'unverifiable expressions of opinion' are not actionable." *Mastercraft Decorators, Inc. v. Orlando*, 356 F. Supp. 3d 259, 274 (W.D.N.Y. 2018) (quotation omitted). "Additionally, 'where the plaintiff is a corporation, a cause of action for libel per se requires the plaintiff to establish that the publication injured its business reputation or its credit standing' and to make 'some allegation tending to establish that its business reputation was harmed.'" *Id.* (quoting *Sandals Resorts Intern. Ltd. v. Google, Inc.*, 86 A.D.3d 32, 39 (1st Dep't 2011)).

Here, Plaintiff contends that Defendant Gross' statements were defamatory *per se* because they impugned the basic integrity, creditworthiness and competence of its business. To succeed on such a claim, courts have held that the "statement must be more than a remark on the business's ability to make a profit or remain in business in the particular field or geographical area." *Kforce, Inc.*, 288 F. Supp. 2d at 517. Further, to be defamatory *per se*, courts have generally required that the statement concern fraud or lack of creditworthiness, or imply that the business will soon cease to exist. *See id.* (citing cases). Contrary to Plaintiff's contentions, Defendant Gross' statements do not constitute defamation *per se*.

Although the alleged defamatory statements are not explicitly included in the proposed amended complaint, Plaintiff has attached the alleged defamatory emails as an exhibit. *See* Dkt.

13

No. 50-2 at 106-12.  In the first email, Defendant Gross informs several individuals from the Parker Company that he has "moved on from Executive Group to Suddath Hospitality Solutions Group" and claims that they are "a HUGE outfit with roughly 20 company locations and partners in nearly every city in the US.  To work for a company that is this financially stable and allows me the opportunity to bid work all over the country was something I couldn't pass up."  *Id.* at 107.  In the next email to employees of Flintlock, Defendant Gross inquires about where they are in the process of the FF&E buyout and indicates that he was moved on to Suddath, which is a "[m]uch larger more stable company" who would like to bid on the project.  *See id.* at 108.  In the next email, Defendant Gross provides his new contact information to employees of the Lam Group and states that he felt "from a personal standpoint [he] needed to move to a more financially secure company" and concluded that he would like an opportunity to "bid the Virgin on the new letterhead."  *Id.* at 109.  In his next email, Defendant Gross again informs the recipients of his new contact information, that bids can be sent to him, and that Suddath is "a HUGE outfit with roughly 20 company locations and partners in nearly every city in the US.  To work for a company that is this financially stable and allows me the opportunity to bid work all over the country was something I couldn't pass up."  *Id.* at 110.  In an email to the point person for the Radisson Harlem project, Defendant Gross inquires if the project had been awarded yet and describes Suddath as a "much larger & stronger company tha[n] Executive Group."  *Id.* at 111.  Finally, in his email to Victor Garcia and George DaSilva, Defendant Gross stated that Executive Group "was growing to[o] fast[ ] to keep up with it's [sic] expenses and I was one of the things that had to go."  *Id.* at 112.  The email continues by stating that he had moved on to Suddath, which Defendant Gross stated does $800 million per year in revenue, that it has contracts with companies such as Google, Nike, and Microsoft, and that it has warehouses "in nearly every city in the US so this is going to

14

be a great move for me." *Id.*

Notably absent from any of these emails was any of the type of disparaging language that has been found sufficient to support a defamation *per se* claim. When the statements are read in their entirety, none of the statements at issue extend to Plaintiff's entire business and they do not impugn Plaintiff's integrity or competence with allegations of fraud or lack of creditworthiness. At best, Defendant Gross' statements can be read as comments on Plaintiff's ability to make a profit and provide stability for its employees while growing its operations, which is insufficient to support a defamation *per se* claim.[3] *See Kforce, Inc.*, 288 F. Supp. 2d at 517; *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550-51 (S.D.N.Y. 2011); *Mastercraft Decorators, Inc.*, 356 F. Supp. 3d at 274.

Moreover, when looking at the broader context of the communications and the writings as a whole, it is clear that any statements that could be considered disparaging to Plaintiff were based on Defendant Gross' opinion, not fact. *See Sandals Resort Intern. Ltd.*, 86 A.D.3d at 41-42. All of the emails at issue were sent by Defendant Gross to inform the recipients that he had left Plaintiff's employment and was now working for Suddath. Defendant Gross' brief explanations for his departure from Plaintiff, where he was still furloughed from work, is clearly his opinion, which is not actionable.[4]

---

[3] Notably, on March 22, 2020, Plaintiff was furloughed from his employment with Plaintiff with no timeframe given to him as to when he would return to work. *See* Dkt. No. 19 at ¶ 20.

[4] Again, the Court reiterates the fact that Defendant Gross had been furloughed by Plaintiff when he sought out new employment opportunities. Even assuming that this claim was not subject to dismissal for the reasons discussed above and proceeded to summary judgment at some point, it is hard to see how Defendant Gross describing Suddath as a "more financially secure company" could possibly be considered a false statement. Suddath is a considerably larger, more

(continued...)

In the amended complaint, Plaintiff also relies on other alleged defamatory statements, in which it fails to identify any relevant information. For example, Plaintiff alleges that, "in addition thereto, the defendant made other intentional falsehoods about the plaintiff's business all to its damage." Dkt. No. 50-2 at ¶ 25. Conclusory allegations of this nature are entirely insufficient to support a defamation cause of action. *See Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 271 (2d Cir. 1999) ("While plaintiffs are not required to plead defamation *in haec verba*, [an] unsupported claim that [the defendant] said 'something bad' about [the plaintiff] to a client fail[s] to afford [the defendant] sufficient notice of the communications complained of") (internal quotation omitted); *see also Sebastiani v. Brooklyn Hospital Ctr.*, No. 19-cv-253, 2019 WL 3281010, *4 (E.D.N.Y. July 19, 2019) (holding that "a complaint alleging defamation is sufficient 'if it adequately identifies the purported communication and provides an indication of who made the communication, when it was made, and to whom it was communicated'") (quotation and other citations omitted). As such, these additional conclusory allegations are insufficient to support Plaintiff's defamation claim.

Accordingly, the Court grants Defendants' motion to dismiss as to Plaintiff's third cause of action and Plaintiff's motion to amend is denied.

**E.      Fourth Cause of Action: Tortious Interference with Prospective Economic Relations**

In its fourth cause of action, Plaintiff contends that Defendants Gross and Suddath "did engage in interference with prospective economic relations by attempting to deny the opportunity for bidding projects by Executive Trim Construction Inc." Dkt. No. 50-2 at ¶ 49. Plaintiff claims

---

[4](...continued)
established company, that was willing to hire Defendant Gross to begin his employment immediately, at a time when he was still on furlough from his employment with Plaintiff.

that this scheme took place by "defendant Gross providing confidential bid computations and information and trade secrets to defendant Suddath and Suddath proceeded to utilize that information to make bids, all of which caused damage monetarily and in good will to the plaintiff." *Id.* at ¶ 50.  In their motion, Defendants contend that this claim should be dismissed because Plaintiff failed to plead, and cannot establish, that any of the alleged conduct "was intended solely to harm plaintiff, involved unlawful 'wrongful means' as defined by the controlling authorities or *actually caused* harm to [a] particular prospective contract or business relationship." Dkt. No. 38-4 at 20 (emphasis in original).

To state a claim for intentional interference with prospective economic advantage under New York law, "a party must allege that: '(i) the plaintiff had business relations with a third-party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.'" *Clean Coal Tech., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 321-22 (S.D.N.Y. 2019) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002)).  "A plaintiff must also establish causation by demonstrating 'that she would have entered into an economic relationship but for the defendant's wrongful conduct.'" *Id.* at 322 (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014)) (other citation omitted); *see also Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 349 (S.D.N.Y. 2009).

"The salient distinction between claims for tortious interference with contract and claims for tortious interference with prospective economic advantage concerns the defendant's mental state: 'In the case of tortious interference with contract, a plaintiff may recover if the plaintiff can demonstrate that the 'defendant's deliberate interference result[ed] in a breach of [the] contract.'"

17

*Clean Coal Tech., Inc.*, 377 F. Supp. 3d at 322 (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004)).  "But '[i]n the case of tortious interference with prospective economic advantage, ... the plaintiff must show more culpable conduct on the part of the defendant.'"  *Id.* (quoting *Carvel*, 3 N.Y.3d at 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100).  "To state a prospective-economic-advantage claim, a plaintiff must show that 'the defendant's conduct ... amount[s] to a crime or an independent tort,' or that the defendant has 'engage[d] in conduct for the sole purpose of inflicting intentional harm on' the plaintiff."  *Id.* (quoting *Carvel*, 3 N.Y.3d at 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100) (other citation omitted); *see also Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 211-12 (S.D.N.Y. 2014) (finding that the mental state for prospective-economic-advantage claim "is more exacting" than that for a contract-interference claim "because courts must balance a plaintiff's expectation in establishing a contractual relationship against the competing interest of the interferer ... and the broader interest of fostering healthy competition") (internal quotation marks and citations omitted).  While New York courts have recognized an exception to this rule "where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs,'" the exception is a narrow one. *Carvel*, 3 N.Y.3d at 190 (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 215 A.D.2d 990 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614 (1996)).  "When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'"  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (quoting *Carvel*, 3 N.Y.3d at 190).  Finally, the Court of Appeals has made clear that "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Carvel*, 3 N.Y.3d at 192.

In the present matter, in response to Defendants' motion, Plaintiff contends that they have adequately pled all the necessary elements of this claim. *See* Dkt. No. 50-10 at 19.  Specifically, Plaintiff argues that it has adequately alleged the existence of business relationships between it and its hospitality clients and that "[t]hose at issue include all clients whose bids were misappropriated by Defendant Gross as well as all those to whom Defendant Gross sent libelous emails impugning Plaintiff's financial capabilities." *Id.*  Further, Plaintiff argues that "Defendants' intentional interference is evidenced by the collaboration between Defendant Gross and Suddath where bids already submitted by Executive Group were intended to be undercut in order to divert those jobs to Suddath so it could enter the New York City market and steal Plaintiff's business." *Id.*  Plaintiff further argues that "there is evidence of malice on the part of Christopher Gross, given his extreme unhappiness with the revisited compensation package that Executive Group offered him prior to his resignation."  *Id.*  Plaintiff contends that this demonstrates that Defendant Gross was "motivated to take as many clients from Executive Group as he could on his way out in order to further damage Plaintiff."  *Id.*  Finally, Plaintiff argues that, even if it has failed to adequately allege malice, "the alternative element of dishonest, unfair, or improper means is clearly satisfied.  Defendant [Gross] disseminated bid documents to his new employer in violation of his duty of loyalty, his acknowledgment and acceptance of his Employee Handbook, and in excess of his authority to obtain and transfer such documents." *Id.*

Initially, the Court finds that Plaintiff's amended complaint fails to plausibly allege the third element of this claim.  The only conduct alleged in the amended complaint relevant to this claim that is aimed at a third party is the alleged defamatory statements Defendant Gross made about Plaintiff's financial stability.  However, the Court has already found that the amended complaint fails to plausibly state a defamation claim.  Therefore, this conduct cannot be the

"independent tort" upon which Plaintiff bases this claim.  The remaining non-conclusory allegations upon which Plaintiff relies involve Defendant Gross providing Defendant Suddath with confidential information.  The amended complaint fails to plausibly allege that this information was actually used by Defendants Gross or Suddath to undercut a bid Plaintiff had made or that any of the other alleged tortious conduct was directed at a third party.  *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. Appx. 102, 106-07 (2d Cir. 2012) (holding that the alleged tortious conduct that was directed at the plaintiff, rather than the third-party client, could not satisfy the wrongful means element).

Finally, Plaintiff has failed to plausibly allege conduct that would satisfy the exception to this element, *i.e.*, that Defendants acted "'for the sole purpose of inflicting intentional harm on plaintiffs.'"  *Carvel*, 3 N.Y.3d at 190 (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 215 A.D.2d 990 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614 (1996)).  Rather, as the amended complaint expressly states, "Defendant Gross wanted to divert Plaintiff's business opportunities for himself and his new employer Suddath."  Dkt. No. 50-2 at ¶ 26.  This alleged conduct represents "'normal economic self-interest'" that has been found insufficient to satisfy the wrongful means element. *See 16 Casa Duse, LLC*, 791 F.3d at 262 (quoting *Carvel*, 3 N.Y.3d at 190).

Similarly, the Court also finds that the proposed amended complaint fails to plausibly allege the fourth element of this claim.  In reference to an email that Defendant Gross sent to representatives of Flintlock, Plaintiff alleges that "the defamatory email and attempted usurpation of the bid by the defendants caused Flintlock to deny the plaintiff's bid."  Dkt. No. 50-2 at ¶ 29. Absent from the allegation, however, is that Defendants actually bid on the Flintlock project and the email that the amended complaint references is a simple inquiry from Defendant Gross about where Flintlock was in the bidding process for the Virgin Hotel.  Thereafter, Plaintiff alleges in an

entirely conclusory fashion that Defendant Suddath used the confidential bid computations and trade secrets provided by Defendant Gross "to make bids, all of which caused damage monetarily and in goodwill to the plaintiff." *Id.* at ¶ 50.[5]  These conclusory allegations are insufficient to plausibly allege that Defendants' conduct injured Plaintiff.

Accordingly, the Court grants Defendants' motion to dismiss as to Plaintiff's fourth cause of action and denies Plaintiff's motion to amend.

## F.     Fifth Cause of Action: Breach of Fiduciary Duty

In its fifth cause of action, Plaintiff alleges that Defendant Gross, as a president of the company, owed it a duty of loyalty, including a duty to not use or disclose Plaintiff's proprietary secrets.  *See* Dkt. No. 50-2 at ¶ 52.

"Under New York law, an employee owes a duty of good faith and loyalty to his employer." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), *aff'd*, 469 F.3d 284 (2d Cir. 2006).  The employee's fiduciary duty to the employer "may continue after termination of the employment relationship." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 914 (2d Cir. 1998).  "Such a continuing duty may, in appropriate circumstances, include the

---

[5] The amended complaint alleges that Suddath used the confidential information provided by Defendant Gross "to make bids, all of which caused damage monetarily and in goodwill to the plaintiff." Dkt. No. 50-2 at ¶ 50.  Notably absent from the proposed amended complaint, however, is any specific factual allegations as to which projects Suddath bid on, and that one or more of these projects were not awarded to Plaintiff.  The omission of these allegations from the proposed amended complaint has a simple explanation.  As discussed in the Court's September 2, 2020 Memorandum-Decision and Order, in the affidavit of Mark A. Scullion, President of Defendant Suddath, Mr. Scullion attested to the fact that Defendant Suddath had not bid and would not bid on any of the projects where Defendant Gross disclosed confidential information to Defendant Suddath regarding Plaintiff's bid for that project.  *See* Dkt. No. 71 at 13 (citing Dkt. No. 22 at ¶¶ 12-15).  Given this information, it is clear why the proposed amended complaint contains no specific factual allegations regarding which bids it lost as a result of Defendant Suddath under-bidding Plaintiff on any potential project.

specific duty not to divert business in which a former employer has the requisite 'tangible expectancy,' ... and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment." *Id.* (internal quotation and other citation omitted). Moreover, the Second Circuit has suggested that soliciting a former employer's customers using information that was taken or copied from the former employer could constitute "an egregious breach of trust and confidence." *N. Atl. Instruments v. Haber*, 188 F.3d 38, 47 (2d Cir. 1999) (quoting *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636, 639 (1972)).

In their motion to dismiss, Defendants contend that Plaintiff has failed to plead any facts giving rise to the existence of a fiduciary relationship. *See* Dkt. No. 38-4 at 21. Further, Defendants argue that even if the Court determines that a fiduciary relationship existed, Plaintiff "has nevertheless failed to plead with particularity what actions allegedly gave rise to a breach of fiduciary duty." *Id.*

"As an initial matter, 'employment relationships do not create fiduciary relationships.'" *Childers v. New York and Presbyterian Hosp.*, 36 F. Supp. 3d 292, 306 (S.D.N.Y. 2014) (quoting *Rather v. CBS Corp.*, 68 A.D.3d 49, 886 N.Y.S.2d 121, 125 (1st Dep't 2009)). Defendants contend that Plaintiff, by its own admission, "acknowledges that, although it gave GROSS the title of 'President,' he was not 'an Owner or principal of the company.'" Dkt. No. 70 at 16 (quoting Dkt. No. 2-1 at ¶ 3). Further, Defendants claim that Plaintiff "admits that Gross was a non-owner employee 'salesman' and his 'President" title was only a 'moniker used to elevate [his] perceived status' and 'assist his sales work.'" *Id.* (citing Dkt. No. 2-1 at ¶ 3; Dkt. No. 50-1 at ¶¶ 6-7). In support of its argument, Defendants rely on two affidavits, one from Lance Orcutt and one from

Plaintiff's counsel, which are materials not appropriately considered on a motion to dismiss.  As such, to the extent that Defendants rely on material outside of the proposed amended complaint, Defendants' arguments must be rejected.

"Whether a fiduciary duty exists 'is necessarily fact-specific to the particular case.'" *Childers*, 36 F. Supp. 3d at 308 (quotation and other citations omitted).  "Therefore, 'a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6).'" *Id.* (quotation omitted).  "On a motion to dismiss, it is often 'impossible to say that plaintiff will be unable to prove the existence of a fiduciary relationship.'" *Id.* (quotation omitted).  Here, the proposed amended complaint alleges that Defendant Gross was given the title of "President" of the company and was given access to confidential information to facilitate in the performance of his work with Plaintiff.  *See* Dkt. No. 50-2 at ¶¶ 8, 9, 52.  Although it is a close call, the Court finds that the allegations in the proposed amended complaint are sufficient to plausibly allege the existence of a fiduciary relationship.

Defendants also contend that, even if the Court finds that Plaintiff has sufficiently alleged the existence of a fiduciary relationship, Plaintiff has nevertheless failed to plead with particularity what actions allegedly gave rise to a breach of a fiduciary duty.  *See* Dkt. No. 38-4 at 21.  Again, the Court disagrees.  The Second Circuit has held that "even former employees may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their endeavors for the company."  *Rothenberg*, 136 F.3d at 906 (citation omitted).  Here, the proposed amended complaint alleges that Defendant Gross disseminated confidential bids to Suddath and attempted to solicit contracts using that information.  At this stage, Plaintiff has plausibly alleged a breach of fiduciary duty in its proposed amended complaint.

Accordingly, Defendants' motion to dismiss Plaintiff breach of fiduciary duty cause of action is denied and Plaintiff's motion to amend is granted.

**G.     Sixth Cause of Action: Unfair Competition**

"A claim for unfair competition based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action." *Uni-Systems, LLC v. United States Tennis Assoc., Inc.*, 350 F. Supp. 3d 143, 179 (E.D.N.Y. 2018) (citations omitted); *see also Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 19-cv-6793, 2021 WL 535217, *6 (E.D.N.Y. Feb. 12, 2021) (dismissing the plaintiff's unfair competition claim as duplicative of the plaintiff's DTSA and common law misappropriation of trade secret claims) (citation omitted); *Data Device Corp. v. W.G. Holt, Inc.*, No. 19-cv-4105, 2020 WL 7024312, *5-6 (E.D.N.Y. Nov. 30, 2020) (dismissing the plaintiff's unfair competition claim where the plaintiff pled common law and DTSA misappropriation of trade secret claims); *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 599-600 (E.D.N.Y. 2000) (treating unfair competition claims based on trade secret misappropriation as a single cause of action) (citations omitted); *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 267-69 (E.D.N.Y. 2016) (dismissing an unfair competition claim that failed to state an independent cause of action under New York law); *Sorias v. National Cellular USA, Inc.*, 124 F. Supp. 3d 244, 262 (E.D.N.Y. 2015) ("[P]laintiff['s] allegations of defendants' bad faith premised on the unlawful copying, misappropriating, knocking off, and stealing of [plaintiffs'] patented designs are insufficient to transform the nature of these claims from patent infringement to an independent common law claim of unfair competition") (citation omitted).

As discussed in detail below, the Court is permitting Plaintiff's trade secret misappropriation claim under the Defend Trade Secrets Act to proceed.  Where, as here, Plaintiff's

unfair competition claim is premised on the same allegations as its misappropriation claim, *see* Dkt. No. 50-2 at ¶¶ 56, 61, it must be dismissed as duplicative.  Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's unfair competition claim and denies Plaintiff's motion to amend.

**H.      Seventh Cause of Action: Hacking in Violation of the CFAA**

In its seventh cause of action, Plaintiff alleges that Defendants jointly and severally violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, "by engaging in the utilization of computers owned by the plaintiff and by misappropriating trade secrets and confidential proprietary information from said computers in excess of any authorization and utilizing them to improperly and illegally obtain and use proprietary information."  Dkt. No. 50-2 at ¶ 58.  In their motion to dismiss, Defendants argues that this claim should be dismissed because the proposed amended complaint fails to allege that Defendant Gross did not have authority to access the subject information while he was employed by Plaintiff and fails to allege that Defendant Gross accessed this information after he resigned.  *See* Dkt. No. 70 at 18-19.  In response, Plaintiff contends that it has sufficiently alleged that "Defendant Gross provided the bid documents owned and protected by Executive Group after his term of employment had ended, thus giving rise to liability under the Computer Fraud and Abuse Act."  Dkt. No. 50-10 at 22.  Plaintiff notes that, on May 5, 2020, Defendant Gross sent Brad Jones of Suddath five bids that Plaintiff had submitted and that this occurred several days after Plaintiff had resigned his position with Plaintiff.  *See id.* at 22-23.

The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, in pertinent part, punishes an individual who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer." 18 U.S.C. §

1030(a)(2)(C). The CFAA was initially enacted solely as a criminal statute to address the "then-novel problem of [computer] hacking." *Hancock v. Cty. of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018). Ten years later it was amended to permit a civil cause of action allowing, among other things, "any person who suffers damage or loss by reason of a violation of this section" of at least $5,000 to bring a claim. 18 U.S.C. § 1030(g); 18 U.S.C. § 1030(c)(4)(A)(i)(I); *accord Sewell v. Bernardin*, 795 F.3d 337, 339-40 (2d Cir. 2015).

Because Defendant Gross was permitted to access Plaintiff's computer system, whether Defendant Gross violated the CFAA turns on the question of whether he "exceed[ed] authorized access" within the meaning of the CFAA.

The meaning of this phrase arose in a similar context in the criminal case of *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015), in which the defendant police officer used his employer's database for personal purposes. The defendant conceded that he had "violated the terms of his employment by putting his authorized computer access to personal use." *Id.* at 523. He contended that he had not "exceeded authorized access," however, because he was authorized in a general sense to look at the database he accessed. *See id.* at 523-24. The Government contended that the defendant "exceeded authorized access" because "his authorization to access [the database] was limited to law enforcement purposes and he conducted a search ... with no such purpose." *Id.* at 524. The Second Circuit summarized the ambiguity in the statutory language as follows: "While 'authorization' could refer, as the Government contends, to the purposes for which one is authorized to access a computer, it could alternatively refer to the particular files or databases in the computer to which one's authorization extends." *Id.*

Applying the rule of lenity, the Second Circuit interpreted the statute "in spatial terms, namely, an employee going beyond the parameters of his access rights." *Id.* at 526. It found that

26

the purpose of the access was not relevant.  *See id.*  The Circuit concluded that a person "'exceeds authorized access' only when he obtains or alters information that he does not have authorization to access for any purpose which is located on a computer that he is otherwise authorized to access."  *Id.* at 511.  While *Valle* was a criminal case, the Supreme Court has noted that courts, when analyzing a statute that "has both criminal and noncriminal applications ... must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).

Following *Valle*'s reasoning, it has been held that the CFAA "does not apply to a 'so-called faithless or disloyal employee' — that is, an employee who has been granted access to an employer's computer and misuses that access, either by violating the terms of use or by breaching a duty of loyalty to the employer."  *Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-cv-8467, 2016 WL 5416498, *6 (S.D.N.Y. Sept. 28, 2016); *accord Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 286 (S.D.N.Y. 2016) ("If an employer has given an employee access to the computer and to the relevant files, the employee's subsequent misuse of the information or misappropriation with the intent to compete with his employer is not sufficient to violate the CFAA").  In other words, "to prevail on its claim under the CFAA, [a plaintiff] must show that [d]efendants accessed its computer system without approval; it is not enough to prove access to information beyond the scope of approval."  *Chefs Diet*, 2016 WL 5416498, at *6.

In *WEC Carolina Energy Solutions, LLC v. Miller*, 687 F.3d 199, 206-07 (4th Cir. 2012),[6] a WEC employee emailed confidential documents he had downloaded to his personal account before resigning from the company to work for a competitor.  *See id.* at 202.  After leaving WEC,

_____

[6] In *Valle*, the Second Circuit cited with approval the reasoning of *WEC Carolina Engergy Solutions LLC v. Miller*, 687 F.3d 199 (4th Cir. 2012).

the former employee used the information in a presentation aimed at attracting a potential WEC customer. *See id.* The potential customer hired the competitor instead of WEC. *See id.* WEC had a policy prohibiting unauthorized use of confidential information or trade secrets, including the downloading of confidential information to a personal computer. *See id.* at 206-07. In its complaint, WEC conceded that its former employee was authorized to access its computer system at the time he downloaded and emailed the confidential information. *See id.* at 207. The Fourth Circuit affirmed the district court's dismissal of the CFAA claim because the employer failed to allege that its former employee had exceeded his authorized access. *See id.* The Fourth Circuit held that an employee exceeds his authorized access "when he has approval to access a computer, but uses his access to obtain or alter information that falls outside the bounds of his approved access." *Id.* at 204 (citation omitted). The court noted that this definition does not extend "to the improper *use* of information validly accessed." *Id.* (emphasis in original).

In the present matter, Plaintiff's proposed amended complaint and opposition to the motion to dismiss fail to allege that Defendant Gross did not have authority to access the subject bid information while he was employed by Plaintiff. Further, Plaintiff has failed to allege that Defendant Gross accessed Plaintiff's computers at all after he resigned. Rather, Plaintiff argues that Defendant Gross "*provided* the bid documents owned and protected by Executive Group after his term of employment had ended, thus giving liability under the Computer Fraud and Abuse Act." Dkt. No. 50-10 at 22 (emphasis added). Although it is undisputed that Defendant Gross provided this information to Suddath after he was no longer employed by Plaintiff, the proposed amended complaint fails to allege that he "accessed" this information "without authorization" or in "excess of authorized access."

Therefore, while it may be plausible to infer from the proposed amended complaint that

Defendant Gross misappropriated confidential information obtained from Plaintiff, it fails to allege that Defendants entered Plaintiff's protected computers/servers "without authorization" or "in excess of authorized access" in violation of the CFAA. *See Associated Mortgage Bankers, Inc. v. Calcon Mutual Mortgage LLC*, 159 F. Supp. 3d 324, 335-36 (E.D.N.Y. 2016); *see also Miller*, 687 F.3d at 206-07 (affirming the dismissal of a CFAA claim because "WEC fails to allege that Miller and Kelley accessed a computer or information on a computer without authorization.... Thus, we agree with the district court that although Miller and Kelley may have misappropriated information, they did not access a computer without authorization or exceed their authorized access"); *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 513 (S.D.N.Y. 2015) ("[T]he Complaint does not adequately allege that Defendant exceeded its authorized access with respect to Plaintiff's computer system. Plaintiff's allegations focus primarily on Defendant's misuse of data obtained through authorized access.... Other allegations of Defendant's purported abuses of the Plaintiff's systems do not discuss the means by which Defendants allegedly gained access to those systems and so cannot be construed as establishing that Defendant either lacked or exceeded its authorization within the meaning of the CFAA"). In sum, Plaintiff's proposed amended complaint merely alleges that Defendant Gross misused documents he was permitted to access through the scope of his employment, which is insufficient to support a claim under the CFAA. *See Amphenol Corp. v. Paul*, 591 Fed. Appx. 34, 36 (2d Cir. 2015) (holding that allegations that a former employee misused documents that he was permitted to access is insufficient to support a claim under the CFAA); *Fischkoff v. Iovance Biotherapeutics, Inc.*, 339 F. Supp. 3d 408, 419 (S.D.N.Y. 2018) (dismissing the plaintiff's claim under the CFAA where the complaint alleged that the defendant "accessed materials that his credentials permitted him to access but that the Employee Handbook instructed him not to access").

It is true that an employee may be liable under the CFAA where access to a computer system "'occurs after the employee is terminated or resigns.'" *Fischkoff*, 339 F. Supp. 3d at 419 (quoting *Sell It Soc., LLC v. Strauss*, No. 15 Civ. 970, 2018 WL 2357261, *3 (S.D.N.Y. Mar. 8, 2018)). The proposed amended complaint, however, does not allege that Defendant Gross accessed Plaintiff's computer system after his termination. *See* Dkt. No. 50-2 at ¶¶ 11-15. Further, the emails upon which Plaintiff relies were all sent from Defendant Gross' personal email account, rather than his work email account provided by Plaintiff. *See* Dkt. No. 50-2. As such, the Court finds that this claim must be dismissed.

Accordingly, Defendants' motion to dismiss Plaintiff's claim under the CFAA is granted and Plaintiff's motion to amend is denied.

## I.     Eighth Cause of Action: Interstate Trade Secret Misappropriation

In its eighth cause of action, Plaintiff contends that Defendants jointly and severally violated 18 U.S.C. §§ 1830-1836, the Defend Trade Secrets Act ("DTSA"), "by engaging in the utilization of computers owned by the plaintiff and by misappropriating trade secrets and confidential proprietary information from said computers and utilizing them to improperly and illegally obtain proprietary information." Dkt. No. 50-2 at ¶ 61. Defendants contend that this claim must be dismissed because all of the hotel jobs at issue in this case involve labor services to install fixtures at sites within New York City and, therefore, Plaintiff's relevant services "do not satisfy Section 1836's 'interstate commerce' requirement." Dkt. No. 70 at 21. In response, Plaintiff argues that the complaint and proposed amended complaint make clear that "'Executive Group is engaged in the business of selling, warehousing, freight, and installation services of furniture, fixtures and equipment (FF&E) to the hospitality industry and others in the eastern United States.'" Dkt. No. 50-10 at 24. Plaintiff argues that such allegations satisfy the broad

30

jurisdictional reach of the DTSA.  *See id.*  Further, Plaintiff contends that the emails Defendant

Gross sent to individuals out of state after his termination also satisfy the interstate commerce

requirement of the DTSA.  *See id.* at 24-25.

The DTSA provides a federal cause of action for trade-secret misappropriation involving a

nexus to interstate commerce.  *See* 18 U.S.C. § 1836(b).  To establish the existence of a trade

secret, a plaintiff must demonstrate, as a threshold matter, that the property in question is

comprised of "financial, business, scientific, technical, economic, or engineering information"

including "formulas, designs, prototypes, methods, techniques, processes, procedures, programs,

or codes."  18 U.S.C. § 1839(3).  The plaintiff must then satisfy two additional statutory

requirements: First, the owner of the purported trade secret must have "taken reasonable measures

to keep such information secret," and second, the information must "derive[ ] independent

economic value, actual or potential, from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain economic value from the

disclosure or use of the information."  *Id.* § 1839(3)(b).

In evaluating reasonable secrecy measures, courts in this Circuit generally look to whether

confidentiality or nondisclosure agreements are in place and whether the information is guarded

by physical- or cyber-security protections.  *See, e.g.*, *Charles Ramsey Co., Inc. v. Fabtech-NY*

*LLC*, No. 1:18-CV-0546, 2020 WL 352614, *16 (N.D.N.Y. Jan. 21, 2020) (citing cases).  The

DTSA "does not provide further guidance on what constitutes 'reasonable measures' to keep the

information secret, and the Second Circuit has not yet construed this statutory term."  *Xavian Ins.*

*Co. v. Marsh & McLennan Companies, Inc.*, No. 18-CV-8273, 2019 WL 1620754, *4 (S.D.N.Y.

Apr. 16, 2019).  What measures are "reasonable" must depend in significant part on the nature of

the trade secret at issue.  *E.g.*, *ClearOne Comm'ns, Inc. v. Bowers*, 643 F.3d 735, 768 (10th Cir.

2011) ("There is no precise definition of what 'reasonable measures' are; what is reasonable depends on the situation"); *Adler v. Loyd*, No. 20-CV-00048, 2020 WL 6060302, *8 (D.D.C. Oct. 14, 2020) ("A reasonable measure depends on the circumstances, not any bright-line rule").

In this case, Defendants do not challenge the underlying elements of Plaintiff's DTSA claim, as set forth above. *See* Dkt. No. 70 at 21-26. Rather, Defendants claim that Plaintiff has failed to plausibly allege the interstate commerce requirement of a DTSA claim, *i.e.*, that the trade secret at issue "is *related to* a product or service *used in*, or *intended for use in* interstate ... commerce." 18 U.S.C. § 1836(b)(1) (emphasis added).

The DTSA provides a federal cause of action for "[a]n owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The Supreme Court observes a distinction between legislation invoking Congress' full power over activity substantially 'affecting [ ] commerce' and legislation which uses more limiting language, such as activities 'in commerce,' and thereby does not purport to exercise the full scope of congressional authority." *United States v. Aleynikov*, 676 F.3d 71, 81 (2d Cir. 2012) (quoting *Jones v. United States*, 529 U.S. 848, 856, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000)).

While "the Supreme Court has broadly construed the phrase 'involving interstate commerce' ... to mean 'the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power[,]'" *Aleynikov*, 676 F.3d at 81 (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037, 156 L. Ed. 2d 46 (2003)), the actual language used in the DTSA is "used *in*, or intended for use *in, interstate ... commerce.*" 18 U.S.C. § 1836(b)(1) (emphasis added). The words "in commerce" are not as broad as the words "involving commerce," or "affecting

commerce," and cover "only persons or activities within the flow of interstate commerce."

*Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273 (1995) (emphasis omitted); *see*

*also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (holding that the term "involving

commerce" "encompasses a wider range of transactions than those actually 'in commerce' — that

is, within the flow of interstate commerce"); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118

(2001) ("The plain meaning of the words 'engaged in commerce' is narrower than the more

open-ended formulations 'affecting commerce' and 'involving commerce'"); *Gulf Oil Corp. v.*

*Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974) (interpreting the "in commerce" language to

"denote only persons or activities within the flow of interstate commerce — the practical,

economic continuity in the generation of goods and services for interstate markets and their

transport and distribution to the consumer").

Despite the fact that Congress did not invoke its full power over activity substantially

affecting commence when it enacted the DTSA, the proposed amended complaint in this matter

adequately pleads the required nexus to interstate commerce.  Specifically, in the proposed

amended complaint, Plaintiff alleges that it "is engaged in the business of selling, warehousing,

freight, and installation services of furniture, fixtures and equipment (FF&E) to the hospitality

industry and others in the eastern United States.  Plaintiff's products and services are utilized in

interstate commerce."  Dkt. No. 50-2 at ¶ 9.  Upon termination, the proposed amended complaint

alleges that Defendant Gross provided Suddath with confidential bid information relating to

projects that Plaintiff was actively seeking, including several projects in and around New York

City.  *See id.* at ¶¶ 11-15.  Although discovery could call into question whether Plaintiff can, in

fact, satisfy the interstate commerce requirement, at this stage, the Court finds that the proposed

amended complaint sufficiently alleges that the alleged misappropriated trade secrets relate to a

product or service used it, or intended for use in, interstate commerce. *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 327 (E.D.N.Y. 2020) (holding that the complaint adequately alleged the interstate commerce requirement of the plaintiff's DTSA claim where "the complaint pleads, *inter alia*, that defendants misappropriated plaintiff's trade secrets, including, *inter alia*, customer lists and pricing information, relating to its services used in interstate commerce, *i.e.*, by customers in the New York metropolitan area, including the State of New Jersey"); *Yager v. Vignieri*, No. 16-cv-9367, 2017 WL 4574487, *2 (S.D.N.Y. Oct. 12, 2017) (finding that the plaintiff's claim "that the DTSA covers trade secrets related to his plastic surgery practice, which he contends serves clients in interstate commerce, [was] at least colorable" and, thus, was not insubstantial or frivolous on its face); *Kraus USA, Inc. v. Magarik*, No. 17-cv-6541, 2020 WL 2415670, *7 (S.D.N.Y. May 12, 2020) (holding that the complaint, which alleged that the plaintiff was a "'nationally renowned' company and its trade secrets are used in interstate commerce" was sufficient to satisfy the interstate commerce requirement under the DTSA).[7]

Based on the foregoing, Defendants' motion to dismiss Plaintiff's DTSA claim is denied and Plaintiff's motion to amend its complaint is granted.

---

[7] Defendants rely on *Islands Hospice, Inc. v. Duick*, No. 19-cv-202, 2019 WL 4620369 (D. Haw. Sept. 23, 2019), in support of their argument that Plaintiff has failed to plead a sufficient nexus to interstate commerce. In that case, however, the plaintiff was a non-profit corporation that provided hospice care solely to residents in the State of Hawaii. *See id.* at *1-2. The plaintiff alleged that the defendant misappropriated its "Supportive Care" program when he created a competing entity also located in Hawaii. *See id.* at *2. The court found that the plaintiff's claim under the DTSA failed because it provided services solely in Hawaii and it could not rely on the fact that it purchased medical supplies from out-of-state to support its claim because the shipping of those medical supplies was "not tethered to its secret information[.]" *Id.* at *5. Further, the court found that simply receiving Medicare funding as part of its payment for its Supportive Care program did not satisfy the jurisdictional requirement. *See id.* at *6. Here, however, Plaintiff has alleged that the proprietary information at issue is specifically used throughout the eastern United States when it bids for projects. Therefore, the Court finds that this case is clearly distinguishable.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 38) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that Plaintiff's motion to amend (Dkt. No. 50) is **GRANTED in part and DENIED in part**;[8] and the Court further

**ORDERS** that Plaintiff shall file a copy of its proposed amended complaint as a separate docket entry, which is now the operative pleading; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 10, 2021
     Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[8] As a result of this Memorandum-Decision and Order, Plaintiff's claims of breach of fiduciary duty (fifth cause of action) and trade secret misappropriation under the DTSA (eighth cause of action) are the only remaining claims.

35